[Civ. No. 2274.   Third Appellate District.—July 11, 1921.]

J. E. WEST et al., Respondents, v. VISALIA ABSTRACT COMPANY, Defendant; J. GOREE, Intervener and Appellant.

[1] BROKER'S COMMISSION—AGREEMENT FOR DIVISION — VALID CONTRACT.—An agreement between real estate brokers for a division of a commission is not illegal or against public policy.

[2] ID.—STATUTE OF FRAUDS INAPPLICABLE.—A contract between brokers for a division of a commission earned on a sale of real estate is not required to be in writing.

[3] APPEAL—FINDING—EVIDENCE.—An appellate court is required to uphold a finding of the trial court if there be any substantial evidence in its favor, regardless of whatever may be the showing in opposition.

[4] BROKER'S COMMISSION—RIGHTS OF RESPECTIVE PARTIES—FINDINGS —SUFFICIENCY OF EVIDENCE.—In this action involving the respective rights of real estate brokers to a commission on a sale of real estate, the evidence is sufficient to support the finding of a verbal agreement of one of the brokers with the owners for the sale and the finding of the agreement between the brokers for the division of the commission.

[5] CONTRACT—EVIDENCE—CONDUCT.—An agreement to the terms of a proposed contract may be evidenced and confirmed by conduct as well as by verbal expression.

APPEAL from a judgment of the Superior Court of Tulare County. W. B. Wallace, Judge. Affirmed.

The facts are stated in the opinion of the court.

Everts & Ewing and Gallaher & Simpson for Appellant.

E. I. Feemster and D. E. Perkins for Respondents.

BURNETT, J.—The record justifies this statement of facts: Messrs. Gibson, Quinn, and Snell were the owners of a certain tract of land in Tulare County. Mr. Gibson agreed with one J. W. Fewel that if the latter would find a purchaser for the land that the owners would sell it for sixty-five thousand dollars cash and Fewel could retain all above that sum that the purchaser might pay for the land. Fewel at once entered into a verbal agreement with one J. E. West that if the latter would assist the former in finding a purchaser they would divide the profits or commissions equally, and, if desirable, they would obtain the assistance of a third party, and in that event they would divide the commissions equally among the three in case of sale. West then approached intervener John Goree and told him of this tract of land and of the terms upon which it could be purchased, and stated that if he would find a purchaser they would divide the profits or commissions equally, that is, that Fewel, West, and Goree would each receive one-third thereof. West told Goree that Fewel only had a verbal agreement with the owners of the land, but that on account of the close personal and business relations between Mr. Gibson and Mr. Fewel he had no doubt that the owners would carry out their agreement. Goree agreed to the proposition and promised to aid in the sale of the land upon the terms proposed. Within a day or two thereafter, and at the express personal direction of West and Fewel, Mr. Goree took an intending purchaser to Mr. Gibson, at Visalia. Mr. Gibson, Mr. Goree, and said purchaser visited the land and then went to see Mr. Quinn, at Exeter. This purchaser could not pay the full purchase price, but only about fifteen thousand dollars in cash, and the balance to be in certain installments. The owners, therefore, fixed the purchase price at seventy-two thousand dollars, upon which they were to pay a commission of five per cent, and on these terms the sale was effected. Immediately thereafter West saw Goree and made inquiry about the deal, at which time the latter stated to the former that he had been unable to close it upon the original basis and that he was compelled to accept a commission of a little more than one thousand nine hundred dollars, and that by reason thereof each would receive a little more than six hundred dollars. Later on Fewel and

West discovered that the commissions amounted to three thousand six hundred dollars and Goree having declined to recognize the claim of plaintiffs according to the contract, and a dispute having thus arisen as to the manner in which the commissions were to be divided, two thousand dollars of which was immediately payable, the owners of the property paid said sum to the Visalia Abstract Company, with instructions to pay the same to the persons entitled thereto. Thereupon, plaintiffs commenced this action against said company to obtain the commissions and Goree filed a complaint in intervention claiming that he was entitled to the whole thereof. At the time of the trial, the Visalia Abstract Company paid the two thousand dollars into court, to be disposed of as directed by the judgment in this action.

[1]   There appears to be nothing illegal or against public policy in such contract. No good reason has been suggested why it may not be enforced. It is to be observed that the transaction involves an agreement between brokers for the division of a commission and does not relate to the payment of a commission by the owners. The owners, for whom the services were performed, have indeed paid the money into court, and are only concerned in being protected against any duplicate claim.

[2]   We do not understand that any objection is made to the validity of the contract on the ground that it was not in writing. In fact, appellant declares in his closing brief: ''We have no quarrel with the authorities cited by counsel in relation to contracts between brokers for a division of commissions earned upon the sale of real estate. There is no law that requires such a contract, or any memorandum thereof, to be in writing. It is also true that where such a contract is carried out and performed and commission is paid to one of the parties to the contract by the vendor of the land, it is immaterial whether or not there had existed a contract in writing between the vendor and the agent selling the land.''

Appellant, though, contends that these principles are not applicable to the situation herein and he particularizes as follows:

1. There is no support for this finding of the court: ''That about the month of February, 1919, J. F. Gibson, A. W. Quinn and E. C. Snell, being then the owners of a

certain tract of land in the county of Tulare, state of California, did verbally agree with plaintiff, J. W. Fewel, that if he could and would find a purchaser for said land at a price to net to them the sum of sixty-five thousand dollars cash, that said J. W. Fewel might retain as his commission and compensation all sums which said purchaser would pay for said land over and above said sum of sixty-five thousand dollars.'' [3] In his contention as to this point, appellant ignores the rule that requires an appellate court to uphold a finding of the trial court, if there be any substantial evidence in its favor, whatever may be the showing in opposition. The very testimony quoted by appellant justifies the finding. J. W. Fewel testified: ''Why I don't remember as to the dates, but it was some week or two weeks before the sale was consummated I had a conversation with Mr. Gibson in the office relative to this land and I suggested to him that if he would make a price on it I thought I might find a buyer, so after some preliminary conversation we agreed that they would take sixty-five thousand dollars net and allow me to make whatever commission I could. . . . I might further state that he was to allow me a few days to carry on the proposition and there was no specified time.'' We must, of course, give full credit to the foregoing testimony and its significance is easily understood. It is true that Fewel seems to have dealt with Gibson alone, but there is no contention that he was not authorized to represent the other owners.

Fewel is indeed corroborated by Gibson, who, testifying in reference to this conversation, said: ''Well, we talked about the selling of this place, and I told Mr. Fewel that he could sell it for sixty-five thousand dollars in cash, net. Q. Was anything said about his retaining anything in excess of that in case he found a purchaser? A. Well, I suppose he was going to make whatever he made over that. I don't know whether we had any conversation about that or not. Of course, he would not sell the land for nothing.'' As stated by the learned trial judge, ''If he gave him a price, if he sold it for more and got the money, he would have the excess, I suppose that would follow naturally.'' True, Mr. Quinn testified that the agreement was that it should be sold to Mr. Fewel for sixty-five thousand dollars and that ''not to my knowledge'' was anything said that if

he did not buy it himself and should sell it to another he should have the surplus.

It would seem to make little difference whether the agreement was to sell it to Fewel or to any purchaser whom he might secure, but, at any rate, the finding is amply supported if we regard Quinn's testimony as adverse.

2. The same claim is made as to this finding: "That thereupon said J. E. West and intervener, John Goree, entered into an agreement whereby in consideration of said Fewel and said West permitting said Goree to find a purchaser for said land, said Goree would attempt to find a purchaser therefor, and in the event that such purchaser was found by said Goree to purchase said land, then said Fewel, West, and Goree should each receive one-third of the commission or profits of making said sale." It may be admitted that the agreement between the parties was not expressed in the identical language of the finding, but it is a fair inference from their conversation that such was their understanding and their engagement.

In reference to his conversation with Mr. Goree, Mr. West testified: "I told him of this land and that we had it for sixty-five thousand dollars net and that I and Mr. Fewel were to have all over sixty-five thousand dollars that we sold it for, and if he cared to have—to help us sell it, we would give him one-third of the commission." Referring to another conversation with Goree he said: "I told him that we were to make all over sixty-five thousand dollars that we sold the land for, and that would be divided three ways equally between him and Mr. Fewel and myself. He said he did not generally work on a split commission, or something to that effect, but he said that looks as though it is easy to sell and I am willing to work. . . . Later in that afternoon I met Mr. Fewel on the street in passing through and I told him our arrangement with Mr. Goree, that Mr. Goree would go down next day with his party, and also the other parties that I had on, and after we had talked a little bit I saw Mr. Goree across the street and I went over and took him to Mr. Fewel and introduced him. Mr. Fewel asked me if I would be down there with him and I said I could not be —in fact, I asked Mr. Fewel to go, and he said he could not go and Mr. Fewel told him to go direct to Mr. Gibson and he would get all the information he needed, any help."

[4] If the trial court believed the foregoing testimony —and obviously it did—it could reach no other conclusion than is contained in said finding. It may be that Goree did not say categorically that he accepted said terms, but they were proposed, and he said he was willing to work, and he immediately acted upon them by securing a purchaser. [5] Of course, an agreement to the terms of a proposed contract may be evidenced and confirmed by conduct as well as by verbal expression.

True, Mr. Goree differs somewhat in his recital of what took place, but we are not concerned with any conflict. We may add that, beyond question, he accepted and acted upon the situation as presented by Fewel and West, and there is evidence that, after the sale was made, he recognized this obligation under the agreement with them to divide the commissions earned into three parts, although at the same time misrepresenting to West the amount of commission actually earned. Respondent calls attention to the fact that this testimony is undisputed.

3. Appellant criticises another finding to the extent that it declares the owners of the property agreed "to pay a commission to the person or persons entitled thereto," the contention being that they agreed to pay it to John Goree. However, it is manifest that this is entirely immaterial. They could not preclude plaintiffs from asserting their claim to their proportion by an agreement that they would pay it to appellant. The fact is, though, that it is a fair inference from the testimony of Mr. Gibson, one of the owners, that they considered plaintiffs to be interested in the commissions and made the agreement accordingly.

4. Appellant makes the point that the evidence does not support the finding that the owners paid two thousand dollars, the portion of the commissions which were due, to the Abstract Company, in escrow to be paid to the persons entitled to receive said commissions. This portion of the finding is utterly immaterial, since it is admitted that the money at the trial was paid into court to abide the judgment. Moreover, Mr. Gibson testified: "All this money went in together, into the escrow fund, and we retained this amount to pay who should have that commission when it was decided on who should have it; and it has laid and laid there all this time." Thus is apparent how little fault can

be found with said finding, even if it be deemed important.

5. The only question that could seemingly invite real controversy arises from the fact that the sale was made upon terms somewhat different from those negotiated by Fewel, and the claim that the owners repudiated or terminated the agreement with said plaintiff prior to the actual sale. Mr. Quinn testified that, when Mr. Goree produced the purchaser, ''we stated that we had offered that place for sixty-five thousand dollars and the proposition that he had was on a contract with a small payment down, and, of course, the other offer we had made of sixty-five thousand dollars did not include any commission. So we outlined the proposition of seventy-two thousand dollars for the property. We were to pay Mr. Goree five per cent commission upon that purchase price, and the terms as stated in the contract.'' He also testified that Mr. Gibson stated that ''the offer we had given Mr. Fewel to buy it at sixty-five thousand dollars cash was off and that we need pay no more attention to that.''

As to the facts, it is to be observed that the parties considered the terms of the sale equivalent to those submitted to Fewel. The variance, at any rate, in that respect is too slight to be of vital importance.

It may be said, also, that it is a fair inference from other testimony that Gibson knew that Goree was acting under an agreement with plaintiffs and in pursuance of said original agreement, and that Gibson had this in view when he made said declaration to Quinn. Indeed, though not positive about it, he was under conviction that Goree told him who had sent him to negotiate for the property. Anyhow, he understood it from his conversation with plaintiffs. Naturally he would inform the other owners, and upon the theory that Goree and Gibson were honest and honorable men, we must assume that the real situation was understood.

Moreover, appellant has unduly magnified the minor circumstances of the case. The essential fact is that there was a joint venture by these three parties upon an agreement to divide equally the profits. It is sententiously stated by respondent as follows: ''Mr. Fewel held the keystone position in the whole transaction from the beginning. It was he who had the knowledge that the land was for sale, and who had the primary right to purchase it. It is not shown

that anyone else knew that the land was on the market.  In order to find a purchaser promptly he took in West under an arrangement that provided that if another broker was taken in, then the commissions were to be divided three ways, or one-third each.  Then we see that Fewel found the land, West found a broker who could find a purchaser, and Goree found the purchaser.''  Manifestly, they all contributed to the result, and after the consummation of their joint project, it is too late for appellant to repudiate his contract and seek to deprive respondents of their just proportion of the fruits of the enterprise.

The judgment is affirmed.

Finch, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 8, 1921.

All the Justices concurred.